UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) |
| | ) 3:13-cv-00405-LRH-VPC |
| v. | ) |
| $40,000.00 IN UNITED STATES CURRENCY, | ) ORDER |
| Defendant. | ) |
| JOHN R. GAGLIARDI, | ) |
| Claimant. | ) |

This is a civil forfeiture action. Before the Court is the United States of America's ("United States") Motion for Summary Judgment. Doc. #83.[1] Claimant John R. Gagliardi ("Gagliardi") filed an Opposition (Doc. #91), to which the United States replied (Doc. #93). The Court held an evidentiary hearing on May 27, 2015, during which the Court heard testimony of the Claimant and officers who seized Defendant currency, and arguments regarding whether the Claimant consented to the search. Doc. #97.

///

///

---

[1] Refers to the Court's docket entry number.

## I. Facts and Procedural History

On April 4, 2013, the Reno Police Department ("RPD") conducted routine drug interdiction activities on a westbound Amtrak train that was stopped in Reno, Nevada. Doc. #83 at 5. During the stop, Officer Danny James ("James") met with passengers Gagliardi and Alex Alan Yampolsky ("Yampolsky") in their sleeper car. *Id.* James initiated the meeting after examining the train's passenger list and noticing that Gagliardi and Yampolsky were traveling on a one-way ticket from Naperville, Illinois, to Emeryville, California, and that the ticket had been purchased one day prior to travel. *Id.*

James approached the sleeper room assigned to Gagliardi and Yampolsky but the room appeared empty. Doc. #98 at 39. James then approached another sleeper car where Gagliardi and Yampolsky were sitting. *Id.* James states that he stood outside the doorway, knocked on the door, identified himself as a police officer, and asked if he could speak with the occupants of the sleeper room. *Id.* at 39-40. James then confirmed that the individuals in this sleeper room were, in fact, Gagliardi and Yampolsky. *Id.* at 42. Gagliardi and Yampolsky stated that they were not traveling with a large amount of currency or illegal drugs. Doc. #83 at 5. James alleges that he asked for permission to search the luggage in their room, and that both Gagliardi and Yampolsky gave full consent to search. Doc. #98 at 42. Gagliardi contests James' testimony regarding this initial contact in several respects. First, Gagliardi states that James was blocking the door, rather than standing outside it. *Id.* at 91. Second, Gagliardi states that James did not identify himself as a police officer, and began searching their luggage shortly after initiating contact, without asking for consent. *Id.* at 91-92. Third, Gagliardi states that when he attempted to approach James, James turned a knife toward Gagliardi and said "you don't f'ing know me." *Id.* at 72. Gagliardi also testified that he detected the scent of alcohol when James entered the room. *Id.* at 77.

During the search, Gagliardi asked James to be careful while looking through the luggage because it contained glass products described as pipes for tobacco use. Doc. #83 at 5. The government states that the glass products found "are of a type typically used for smoking

marijuana." *Id.* When asked why he was carrying a large number of glass pipes on the train, Gagliardi responded that he was traveling to Alameda, California, to attend a glass show connected to his glass selling business. James then searched Gagliardi's backpack and found a Chase Bank envelope that contained a large number of $100 bills. *Id.* at 6. While searching the remainder of the room and luggage, James found three other Chase Bank envelopes containing large quantities of $100 bills. The envelopes were located (1) in Gagliardi's backpack, (2) in a laptop computer case found inside the backpack, (3) sewn inside the lining of Gagliardi's jacket found in Gagliardi's backpack, and (4) inside a cell phone box found in a red duffel bag owned by Gagliardi. *Id.*

After discovery of the four envelopes containing $100 bills, James requested that Detective Madhu Karup ("Karup") join him in Gagliardi and Yampolsky's room to continue the questioning. *Id.* Karup continued Gagliardi's interview in a separate room while James searched Yampolsky's luggage, allegedly with consent, and found a Chase Bank envelope containing a large quantity of $100 bills. *Id.* at 7. Yampolsky told James that the currency belonged to Gagliardi and was earned in connection with his glass business.[2] *Id.* Yampolsky added that he and Gagliardi were traveling to a glass show in Seattle, Washington. *Id.* Meanwhile, Gagliardi told Karup that he was traveling to California to purchase marijuana[3] and that he possessed approximately $50,000 in U.S. currency. *Id.* Gagliardi added that he was carrying such a large amount of currency because he did not trust banks.[4] *Id.* The United States alleges that Gagliardi and Yampolsky each consented to a search of their cell phones. *Id.* at 8. The search yielded images of marijuana, marijuana being processed, and images of Gagliardi's glass pipes. *Id.* Gagliardi stated that the photographs were not his, and that the officers likely placed the photographs on his cell phone during their search. *Id.*

---

[2] The United States alleges that Gagliardi "characterized his glass-selling business as an illegal business." Doc. #83 at 5. Gagliardi responds that he merely meant that "it was not incorporated and he did not have a business license." Doc. #91 at 9.

[3] Gagliardi states that he "was authorized to use medical marijuana by his doctor and has had a medical marijuana card for years prior to the seizure." Doc. #91 at 3.

[4] The United States points out that Gagliardi made this claim "even though the currency was located in Chase Bank envelopes." Doc. #83 at 7.

Gagliardi contests the government's allegations that he consented to the searches of his room, luggage, and cell phone. Specifically, Gagliardi states that the individuals who searched his room did not identify themselves as police officers, and "he was intimidated and threatened with a knife" prior to the search. Doc. #91 at 9, 12. Gagliardi adds "that he was not asked how much cash he had, and that he did not have any cash sewn in his jacket, it merely went into the lining of his coat because of a hole in his pocket." *Id.* at 9. Finally, Gagliardi states that he never told the officers that he intended to buy a pound of marijuana, and that any reference to marijuana was related to his status as a medical marijuana patient outside of Nevada. *Id.* at 12.

The RPD seized the currency in the five Chase Bank envelopes found in Gagliardi's belongings and transported the currency to the RPD office where a trained drug-detection canine, "Rhoden," alerted to the odor of illegal drugs on the currency. *Id.* The RPD then counted the currency and determined that the four envelopes found in Gagliardi's luggage totaled $40,000, and the one envelope attributable to Yampolsky contained $9800. *Id.* Thereafter, the currency was transported to a Bank of America branch office, where it was deposited into the City of Reno Evidence Impound Account. Doc. #39, Ex. 1. According to the United States, the currency was then converted by RPD officers to a cashier's check payable to the United States Marshals Service ("USMS") and was deposited into the USMS Seized Asset Deposit Fund. *See* Doc. #41 at 3.

The Verified Complaint alleges that the defendant property: (1) is proceeds traceable to exchanges of controlled substances in violation of Title II of the Controlled Substances Act, 21 U.S.C. § 801 *et seq.*, and is subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(6); (2) was furnished or was intended to be furnished in exchange for controlled substances in violation of Title II of the Controlled Substances Act, 21 U.S.C. § 801 *et seq.*, and is subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(6); and (3) was used or was intended to be used to facilitate violations of Title II of the Controlled Substances Act, 21 U.S.C. § 801 *et seq.*, and is subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(6). Doc. #1, ¶¶25-28. The United States filed the present Motion for Summary Judgment on September 12,

2014. Doc. #83. The Court has considered all briefing, evidence presented at the May 27, 2015, evidentiary hearing, and all arguments of the parties.

**II.   Legal Standard**

Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In assessing a motion for summary judgment, the evidence, together with all inferences that can reasonably be drawn therefrom, must be read in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986); *Cnty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1154 (9th Cir. 2001).

The moving party bears the burden of informing the court of the basis for its motion, along with evidence showing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). On those issues for which it bears the burden of proof, the moving party must make a showing that is "sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986); *see also Idema v. Dreamworks, Inc.*, 162 F.Supp.2d 1129, 1141 (C.D. Cal. 2001).

To successfully rebut a motion for summary judgment, the nonmoving party must point to facts supported by the record which demonstrate a genuine issue of material fact. *Reese v. Jefferson Sch. Dist. No. 14J,* 208 F.3d 736 (9th Cir. 2000). A "material fact" is a fact "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *See v. Durang*, 711 F.2d 141, 143 (9th Cir. 1983). A dispute regarding a material fact is considered genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248. The mere existence of a scintilla of evidence in support of the nonmoving party's position is insufficient to establish a

///

genuine dispute; there must be evidence on which the jury could reasonably find for the nonmoving party. *See id.* at 252.

The exclusionary rule applies in civil forfeiture cases. *One 1958 Plymouth Sedan v. Pennsylvania*, 380 U.S. 693, 702 (1965); *United States. v. $493,850.00 in U.S. Currency*, 518 F.3d 1159, 1164 (9th Cir. 2008). The rule "bars the admission of evidence obtained in violation of the U.S. Constitution, as well as 'fruits of the poisonous tree.'" *$493,850.00 in U.S. Currency*, 518 F.3d at 1164 (quoting *United States v. Ramirez-Sandoval*, 872 F.2d 1392, 1395 (9th Cir. 1989)). "[U]nder the 'fruits of the poisonous tree' doctrine, evidence obtained subsequent to a violation of the Fourth Amendment is tainted by the illegality and is inadmissible." *Id.* at 1164-65 (quoting *United States v. Washington*, 490 F.3d 765, 774 (9th Cir. 2007)).

**III.    Discussion**

Under the Civil Asset Forfeiture Reform Act of 2000 ("CAFRA"), the government has the burden to prove by a preponderance of the evidence that the defendant property is subject to forfeiture. 18 U.S.C. § 983(c); *United States v. $80,180.00 in U.S. Currency*, 303 F.3d 1182, 1184 (9th Cir. 2002). When "the Government's theory of forfeiture is that the property was used to commit or facilitate the commission of a criminal offense, or was involved in the commission of a criminal offense, the Government shall establish that there was a substantial connection between the property and the offense." 18 U.S.C. § 983(c)(3). The determination of whether the government has met its burden of proof is based on the aggregate of facts, including circumstantial facts. *United States v. $42,500.00 in U.S. Currency*, 283 F.3d 977, 980 (9th Cir. 2002); *United States v. U.S. Currency, $30,060.00*, 39 F.3d 1039, 1041 (9th Cir. 1994). Once the government meets its burden, the burden shifts to the claimant to prove by a preponderance of the evidence that he or she is an innocent owner of the property. 18 U.S.C. § 983(d). Specifically, the claimant has the burden to "prove the money had an independent source and had not been used illegally." *United States v. $22,474.00 in U.S. Currency*, 246 F.3d 1212, 1217 (9th Cir. 2001) (citing *United States v. $215,300.00 in U.S. Currency*, 882 F.2d 417, 420 (9th Cir. 1989)).

Here, the United States is pursuing forfeiture under 21 U.S.C. § 881(a)(6), which subjects currency to forfeiture if: (1) it were "intended to be furnished . . . in exchange for a controlled substance," (2) it were "proceeds traceable to such an exchange," or (3) it were "intended to be used to facilitate a violation of [the Controlled Substances Act, 21 U.S.C. § 801 *et seq*.]" Therefore, the United States has the initial burden to establish that a "substantial connection" exists between the currency and an illicit transaction by a preponderance of the evidence.

Prior to establishing that property seized is subject to civil forfeiture as a matter of law under 18 U.S.C. § 983(c), the government must first establish that the search that yielded discovery of the seized material was constitutionally valid. Here, the United States contends that Gagliardi consented to a search. However, Gagliardi states that he did not consent, he was not aware that the plain-clothed individuals who requested to search his room and belongings were police officers, and that one of the individuals threatened Gagliardi with a knife to obtain consent.

Consent to a search that was obtained by threats or coercion is not valid. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 233 (1973) (noting that consent is not voluntarily if "coerced by threats or force, or granted only in submission to a claim of lawful authority"). "It is the government's burden to prove that the consent was freely and voluntarily given." *United States v. Patayan Soriano*, 361 F.3d 494, 501 (9th Cir. 2003). "Whether consent to a search was voluntary, or was the product of duress or coercion, is a question of fact to be determined from the totality of the circumstances." *United States v. Carbajal*, 956 F.2d 924, 930 (9th Cir. 1992). To determine whether consent is voluntary, courts consider five factors: "(1) whether defendant was in custody, (2) whether the arresting officers have their guns drawn, (3) whether Miranda warnings have been given, (4) whether the defendant was told he has a right not to consent, and (5) whether defendant was told a search warrant could be obtained." *United States v. Castillo*, 866 F.2d 1071, 1082 (9th Cir. 1988) (internal citations omitted).

These factors weigh in favor of Gagliardi. Although Gagliardi was not in custody in the traditional sense, he was confined to a train compartment with the officer near the door, and

Gagliardi testified that he did not feel free to leave.[5] James did not have his gun drawn, but Gagliardi alleges that James showed him a knife, and made a threatening comment. Moreover, James' imposing size could have contributed to a sense of intimidation, especially in light of Gagliardi's age—twenty-three or twenty-four years old at the time. Doc. #98 at 83. The United States has not alleged that Gagliardi was read Miranda warnings, told that he had a right not to consent, or told that a search warrant could be obtained.

The Court further notes that James' memory of his initial contact with Gagliardi and Yampolsky was equivocal. James stated that he *believed* that both Gagliardi and Yampolsky responded when he initiated contact, and that he *believed* he asked about the contents of their luggage before the search. Doc. #98 at 41-42. Gagliardi expressly contradicts these beliefs, and contends that James began searching the luggage without identifying himself or asking for consent. *Id.* at 76-77. Importantly, the officers did not take any steps to confirm that Gagliardi consented to the search of his bag. Gagliardi was not given a consent to search form, and no other officer was present (although two other officers were working with James and were nearby) during Gagliardi's questioning to confirm that the search was consensual. Such corroborating evidence could refute genuine disputes of material fact, and the absence of such evidence contributes to the failure of proof in this case.

In sum, the government has not met its burden to establish that Gagliardi freely consented to the search of his luggage. If Gagliardi did not consent, or if consent was obtained by intimidation, then the Court cannot find in the United States' favor on the currency seized as a result of the search because defective consent would taint all evidence discovered based on said consent. *See One 1958 Plymouth Sedan*, 380 U.S. at 702 (1965) (holding that the exclusionary rule applies to civil forfeiture cases). Accordingly, the Court reaffirms its previous denial of the United States' Motion for Summary Judgment (Doc. #94). Furthermore, the Court finds that Gagliardi is entitled

---

[5] James testified that he was standing outside the door, and did not block the door. Gagliardi testified that James stepped about six inches into the doorway, so that the door could not close.

to judgment because the Court has found as a matter of law—after the United States presented its evidence on the issue of consent at the May 27, 2015, hearing—that the United States has not met its burden to establish that Gagliardi consented to the search of his luggage.

**IV.  Conclusion**

IT IS THEREFORE ORDERED that the Court reaffirms that the United States' Motion for Summary Judgment (Doc. #83) is DENIED.

IT IS FURTHER ORDERED that the clerk of court shall enter judgment in favor of Gagliardi and against the United States.

IT IS SO ORDERED.

DATED this 24th day of June, 2015.

_____
LARRY R. HICKS
UNITED STATES DISTRICT JUDGE