UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | 3:13-cv-00405-LRH-VPC |
| v. ) | |
| ) | |
| $40,000.00 IN UNITED STATES ) | ORDER |
| CURRENCY, ) | |
| ) | |
| Defendant. ) | |
| ) | |
| JOHN R. GAGLIARDI, ) | |
| ) | |
| Claimant. ) | |
| ) | |

Before the Court is Claimant John R. Gagliardi's ("Gagliardi") Motions for Attorney Fees, Interest, and Non-Taxable Costs. Doc. #102; Doc. #103.[1] The United States of America ("United States") filed a Response (Doc. #104), to which Gagliardi replied (Doc. #107).

**I.     Facts and Procedural History**

On April 4, 2013, the Reno Police Department ("RPD") conducted routine drug interdiction activities on a westbound Amtrak train that was stopped in Reno, Nevada. Doc. #83 at 5. During the stop, Officer Danny James ("James") met with passengers Gagliardi and Alex Alan Yampolsky ("Yampolsky") in their sleeper car. *Id.* James initiated the meeting after examining the train's

---

[1] Refers to the Court's docket number.

passenger list and noticing that Gagliardi and Yampolsky were traveling on a one-way ticket from Naperville, Illinois, to Emeryville, California, and that the ticket had been purchased one day prior to travel. *Id.*

James approached the sleeper room assigned to Gagliardi and Yampolsky but the room appeared empty. Doc. #98 at 39. James then approached another sleeper car where Gagliardi and Yampolsky were sitting. *Id.* James states that he stood outside the doorway, knocked on the door, identified himself as a police officer, and asked if he could speak with the occupants of the sleeper room. *Id.* at 39-40. James then confirmed that the individuals in this sleeper room were, in fact, Gagliardi and Yampolsky. *Id.* at 42. Gagliardi and Yampolsky stated that they were not traveling with a large amount of currency or illegal drugs. Doc. #83 at 5. James alleges that he asked for permission to search the luggage in their room, and that both Gagliardi and Yampolsky gave full consent to search. Doc. #98 at 42. Gagliardi contests James' testimony regarding this initial contact in several respects. First, Gagliardi states that James was blocking the door, rather than standing outside it. *Id.* at 91. Second, Gagliardi states that James did not identify himself as a police officer, and began searching their luggage shortly after initiating contact, without asking for consent. *Id.* at 91-92. Third, Gagliardi states that when he attempted to approach James, James turned a knife toward Gagliardi and said "you don't f'ing know me." *Id.* at 72. Gagliardi also testified that he detected the scent of alcohol when James entered the room. *Id.* at 77.

During the search, Gagliardi asked James to be careful while looking through the luggage because it contained glass products described as pipes for tobacco use. Doc. #83 at 5. The government states that the glass products found "are of a type typically used for smoking marijuana." *Id.* When asked why he was carrying a large number of glass pipes on the train, Gagliardi responded that he was traveling to Alameda, California, to attend a glass show connected to his glass selling business. James then searched Gagliardi's backpack and found a Chase Bank envelope that contained a large number of $100 bills. *Id.* at 6. While searching the remainder of the room and luggage, James found three other Chase Bank envelopes containing large quantities

2

of $100 bills. The envelopes were located (1) in Gagliardi's backpack, (2) in a laptop computer case found inside the backpack, (3) sewn inside the lining of Gagliardi's jacket found in Gagliardi's backpack, and (4) inside a cell phone box found in a red duffel bag owned by Gagliardi. *Id.*

After discovery of the four envelopes containing $100 bills, James requested that Detective Madhu Karup ("Karup") join him in Gagliardi and Yampolsky's room to continue the questioning. *Id.* Karup continued Gagliardi's interview in a separate room while James searched Yampolsky's luggage, allegedly with consent, and found a Chase Bank envelope containing a large quantity of $100 bills. *Id.* at 7. Yampolsky told James that the currency belonged to Gagliardi and was earned in connection with his glass business.[2] *Id.* Yampolsky added that he and Gagliardi were traveling to a glass show in Seattle, Washington. *Id.* Meanwhile, Gagliardi told Karup that he was traveling to California to purchase marijuana[3] and that he possessed approximately $50,000 in U.S. currency. *Id.* Gagliardi added that he was carrying such a large amount of currency because he did not trust banks. *Id.* The United States alleges that Gagliardi and Yampolsky each consented to a search of their cell phones. *Id.* at 8. The search yielded images of marijuana, marijuana being processed, and images of Gagliardi's glass pipes. *Id.* Gagliardi stated that the photographs were not his, and that the officers likely placed the photographs on his cell phone during their search. *Id.*

Gagliardi contests the government's allegations that he consented to the searches of his room, luggage, and cell phone. Specifically, Gagliardi states that the individuals who searched his room did not identify themselves as police officers, and "he was intimidated and threatened with a knife" prior to the search. Doc. #91 at 9, 12. Gagliardi adds "that he was not asked how much cash he had, and that he did not have any cash sewn in his jacket, it merely went into the lining of his coat because of a hole in his pocket." *Id.* at 9. Finally, Gagliardi states that he never told the

---

[2] The United States alleges that Gagliardi "characterized his glass-selling business as an illegal business." Doc. #83 at 5. Gagliardi responds that he merely meant that "it was not incorporated and he did not have a business license." Doc. #91 at 9.

[3] Gagliardi states that he "was authorized to use medical marijuana by his doctor and has had a medical marijuana card for years prior to the seizure." Doc. #91 at 3.

officers that he intended to buy a pound of marijuana, and that any reference to marijuana was related to his status as a medical marijuana patient outside of Nevada. *Id.* at 12.

The RPD seized the currency in the five Chase Bank envelopes found in Gagliardi's belongings and transported the currency to the RPD office where a trained drug-detection canine, "Rhoden," alerted to the odor of illegal drugs on the currency. *Id.* The RPD then counted the currency and determined that the four envelopes found in Gagliardi's luggage totaled $40,000, and the one envelope attributable to Yampolsky contained $9800. *Id.* Thereafter, the currency was transported to a Bank of America branch office, where it was deposited into the City of Reno Evidence Impound Account. Doc. #39, Ex. 1. According to the United States, the currency was then converted by RPD officers to a cashier's check payable to the United States Marshals Service ("USMS") and was deposited into the USMS Seized Asset Deposit Fund. *See* Doc. #41 at 3.

On April 15, 2015, the Court denied the United States' motion for summary judgment and set an evidentiary hearing on the question of whether Gagliardi consented to the search of his possessions. Doc. #94. The Court held an evidentiary hearing on May 27, 2015, during which the Court heard testimony of the Claimant and officers who seized Defendant currency, and arguments regarding whether the Claimant consented to the search. Doc. #97. On June 24, 2015, the Court reaffirmed its denial of the United States' motion for summary judgment, and finding that the United States had not met its burden to establish that Gagliardi consented to the search of his luggage, entered judgment in favor of Gagliardi. Doc. #99. Gagliardi filed his Motion for Attorney Fees, Interest, and Non-Taxable Costs on July 7 and 8, 2015. Doc. #102; Doc. #103.

**II.     Legal Standard**

CAFRA provides that "in any civil proceeding to forfeit property . . . in which the claimant substantially prevails, the United States shall be responsible for . . . reasonable attorney fees and other litigation costs reasonably incurred by the claimant. 28 U.S.C. § 2465(b)(1)(A). Courts apply the lodestar method to calculate reasonable attorney fees under CAFRA. *United States v. $186,416.00 in U.S. Currency*, 652 F.3d 753, 755 (9th Cir. 2011). "The 'lodestar' is calculated by

4

multiplying the number of hours the prevailing party reasonably expended on the litigation by a reasonable hourly rate." *Morales v. City of San Rafael*, 96 F.3d 359, 363 (9th Cir. 1996). "[T]he fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates." *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983). The actual fee agreement between the claimant and his or her attorney can also be relevant to a court's determination of reasonable attorney fees. *$186,416.00 in U.S. Currency*, 652 F.3d at 755.

The number of hours for which the fee applicant is entitled to recover "may be reduced by the court where documentation of the hours is inadequate; if the case was overstaffed and hours are duplicated; if the hours expended are deemed excessive or otherwise unnecessary." *Chalmers v. City of Los Angeles*, 796 F.2d 1205, 1210 (9th Cir. 1986). "In determining a reasonable hourly rate, the district court should be guided by the rate prevailing in the community for similar work performed by attorneys of comparable skill, experience, and reputation." *Id.* at 1210-11. An attorney "is not required to record in great detail how each minute of his time was expended," but should "identify the general subject matter of his time expenditures." *Hensley*, 461 U.S. at 437 n.12. District courts are empowered to reduce attorney fee awards if the "documentation of hours is inadequate," and courts are encouraged to exclude hours that were not "reasonably expended." *Id.* at 433; *Sorenson v. Mink*, 239 F.3d 1140, 1146 (9th Cir. 2001). When faced with unreasonable claimed fees, courts can apply a percentage reduction to reduce the proposed award to a more reasonable fee award. *Stewart v. Gates*, 987 F.2d 1450, 1452 (9th Cir. 1993).

### III.  Discussion

#### A.  Attorney Fees

As an initial matter, the Court notes that Gagliardi is entitled to reasonable attorney fees because he substantially prevailed when the Court denied the United States' motion for summary judgment and granted judgment in his favor on June 24, 2015.[4] Doc. #99. Specifically, the Court determined that after presenting evidence at the May 27, 2015, evidentiary hearing, the United

---

[4] The United States concedes that Gagliardi has "substantially prevailed." Doc. #104 at 7.

States failed to meet its burden to establish that Gagliardi's purported consent to search his belongings was freely and voluntarily given. *See United States v. Patayan Soriano*, 361 F.3d 494, 501 (9th Cir. 2003) ("It is the government's burden to prove that consent was freely and voluntarily given."); *United States v. Castillo*, 866 F.2d 1071, 1082 (9th Cir. 1988) (listing five factors courts weigh to determine if consent was voluntary). Gagliardi seeks $136,714.00 in attorney fees, which represents 345.60 hours of work expended by two attorneys and one paralegal over a twenty-four month period. Stephen S. Kent ("Kent") billed at an hourly rate of $400; Anne J. Williams ("Williams") billed at an hourly rate of $350; and Sherril A. Metcalf ("Metcalf")[5] billed at an hourly rate of $180. Gagliardi expressly agreed to these hourly rates in his Retainer Agreement. Doc. #107, Ex. 1.

### 1. Williams

The United States' Response challenges the entire 9.3 hours billed by Williams at $350 per hour because Gagliardi did not establish in his Motion that Williams had been retained by Gagliardi or that she was employed by Kent.[6] For this reason, the United States argued that "[t]he *reasonableness* of her work cannot be fully evaluated without additional information about the *reason* for her involvement in this case." Doc. #104 at 9. Gagliardi affirmed in his reply that Williams is an associate at Kent's law firm, and attached Gagliardi's Retainer Agreement, which states that Kent may have associates work on the case at a rate of $350 per hour. Doc. #107 at 4; Ex. 1 at 1. This document is sufficient to explain the reason for Williams' involvement in the case.

Next, the United States challenges 0.4 hours billed by Williams ($140 billed) in late April 2015 for communicating with attorneys with experience in criminal law about challenging civil

---

[5] The United States does not contest the reasonableness of the 2.3 hours of paralegal time expended by Metcalf.

[6] In this Order, the Court primarily considers those fees specifically challenged by the United States. *See* D. Nev. LR 54-16(e) ("If an opposition is filed, it shall set forth the specific charges that are disputed and state with reasonable particularity the basis for such opposition."); *Nagy v. Grobstein*, No. 2:04-cv-1244, 2006 WL 2385383, at *2 (D. Nev. Aug. 17, 2006). However, the Court has reviewed Gorman's complete list of billed fees and determines that no fees not identified by the United States warrant exclusion.

forfeiture actions. The United States argues that these hours appear to have been unnecessary because Williams did not bill more hours until September 2013, when she conducted additional research regarding forfeiture actions: "The description of work suggests that Ms. Williams was simply educating herself on general principles of forfeiture litigation rather than performing compensable work properly billed to Gagliardi and reimbursed under CAFRA." Doc. #104 at 9-10. The Court finds that these hours were not unreasonable. First, Williams made these communications shortly after Gagliardi retained Kent as his attorney, on April 23, 2013. Second, attorneys are entitled to bill for reasonable hours spent educating himself or herself about an area of law. *See Nev. Controls, LLC v. Wind Pump Power LLC*, No. 3:12-cv-0068, 2013 WL 3864232, at *2 (D. Nev. July 24, 2013) (quoting *Grove v. Wells Fargo Fin. Cal., Inc.*, 606 F.3d 577, 580 (9th Cir. 2010)) ("The Ninth Circuit has held that reasonable attorney's fees 'include certain litigation expenses' including . . . legal research."). The Court finds that 0.4 hours is not unreasonable and declines to strike these entries from Williams' billed hours.

### 2.   **Unsuccessful Discovery Pleadings**

The bulk of the United States' Response to Gagliardi's proposed attorney fees challenges hours charged by Kent for unsuccessful discovery pleadings, which in one case resulted in an award of attorney fees for the United States. The United States identifies six pleadings for which it argues Gagliardi should not be compensated: (1) an opposition to the United States' motion to compel (Doc. #17), which the Court granted (Doc. #32); (2) a motion to compel (Doc. #37), which the Court denied (Doc. #47) and ordered Gagliardi to pay the United States' attorney fees (Doc. #73); (3) a motion for sanctions (Doc. #39), which the Court denied (Doc. #74); (4) a motion for reconsideration (Doc. #54), which the Court denied (Doc. #73); (5) objections to the Magistrate's Order (Doc. #55), which the Court overruled (Doc. #77); and (6) a motion to compel (Doc. #38), which was subsequently withdrawn (Doc. #64). The United States argues that billing for such motions "should be wholly eliminated from any fee calculation or, alternatively, an 'across-the-

///

7

board' percentage reduction of the fee should be imposed to account for the non-compensable time." Doc. #104 at 10.

A number of courts have held that a successful litigant "may recover fees only for work related to the claim on which he prevailed, and the fees awarded on that claim must be reasonable in relation to the success achieved." *Williams v. First Gov't Morg. and Invs. Corp.*, 225 F.3d 738, 746 (D.C. Cir. 2000) (citing *Hensley*, 461 U.S. at 434); *see also Clark v. Marsh*, 609 F. Supp. 1028, 1035 (D.D.C. 1985) ("Hours spent on issues on which Plaintiff did not prevail are not compensable."). In the Ninth Circuit, courts apply a two-part analysis to determine whether fees can be recovered for issues on which a party was unsuccessful. *Thorne v. City of El Segundo*, 802 F.2d 1131, 1141 (9th Cir. 1986). "First, the court asks whether the claims upon which the [party] failed to prevail were related to the [party's] successful claims. If unrelated, the final fee award may not include time expended on the unsuccessful claims." *Id.* (citing *Hensley*, 461 U.S. at 434-35). If the claims are related, then the court considers the "significance of the overall relief obtained by the [party] in relation to the hours reasonably expended on the litigation." *Id.* If the party "obtained 'excellent results,' full compensation may be appropriate, but if only 'partial or limited success' was obtained, full compensation may be excessive." *Id.* This determination lies within the district court's discretion. *Id.*

The standard articulated by *Hensley*—declining to grant attorney fees on claims for which a litigant is unsuccessful—contemplates a litigant's limited success, such as when entire claims for relief are rejected.[7] 461 U.S. at 434-36 (finding that the "results obtained" factor is "particularly crucial where a plaintiff is deemed 'prevailing' even though he succeeded on only some of his claims for relief"). Here, by contrast, Gagliardi requests attorney fees for discovery pleadings that do not involve separate claims that were ultimately unsuccessful. Rather, the unsuccessful discovery pleadings were directly related to Gagliardi's sole relief sought: dismissal of the United

---

[7] *Hensley* applied this standard specifically to a fee shifting statute under 18 U.S.C. § 1988, but the Court stated that it was "generally applicable in all cases in which Congress has authorized an award of fees to a 'prevailing party.'" 461 U.S. at 433 n.7.

States' motion for summary judgment.  Importantly, Gagliardi eventually achieved "excellent results" because the Court denied the United States' motion for summary judgment and entered judgment in Gagliardi's favor.

A number of Courts have held that a party may recover attorney fees for unsuccessful discovery motions. *See, e.g.*, *Arnett v. Hartford Life and Acc. Ins. Co.*, 558 F. Supp. 2d 975, 981 (C.D. Cal. 2007) (declining to strike hours spent on unsuccessful discovery motions because "the discovery matters and motion to compel were directly related to the claim on which plaintiff won substantial relief"); *Jones v. County of Sacramento*, No. 09-1025, 2011 WL 3584332, at *13 (E.D. Cal. Aug. 12, 2011) (declining to reduce attorney fees for unsuccessful discovery motions that were "inextricably intertwined" with the underlying claims).  The Court finds that the challenged discovery motions, though unsuccessful, were directly related to Gagliardi's successful challenge to the United States' civil forfeiture action.  Accordingly, the Court does not reflexively strike all fees related to Gagliardi's unsuccessful discovery motions.  *See Hensley*, 461 U.S. at 435 (finding that a court should not reduce the fee of a party who obtained excellent results "simply because [the party] failed to prevail on every contention raised in the lawsuit").  However, the Court agrees with the United States that Gagliardi is not entitled to recover attorney fees for those hours billed for the February 28, 2014, Motion to Compel (Doc. #37), which the Court denied (Doc. #47), because the Court had granted attorney fees in the amount of $2639.50 to the United States (Doc. #73) for time spent responding to Gagliardi's motion.  The Court also strikes those hours expended in the related Motion to Compel (Doc. #38), which was subsequently withdrawn (Doc. #64).   Having already found that the United States was entitled to attorney fees as the successful party responding to these motions, the Court declines to grant Gagliardi attorney fees for work preparing and filing the same motions.

Thus, although the Court finds that the majority of Gagliardi's discovery pleadings were not unreasonable, the Court strikes the 17.9 hours that Gagliardi's attorneys spent on February 19, 20, and 26 filing Motions to Compel that were unsuccessful, and on which the Court already granted

9

attorney fees in the United States' favor. Accordingly, the Court reduces Gagliardi's requested attorney fee award by $7160.00, resulting in an award of $129,554.00 before any percentage reduction.

### 3. Percentage Reduction

District courts have discretion to reduce attorney fee awards "if the hours are deemed excessive or otherwise unnecessary." *Chalmers*, 796 F.2d at 1210. In cases involving a very large fee request, "the district court has the authority to make across-the-board percentage cuts either in the number of hours claimed or in the final lodestar figure 'as a practical means of trimming the fat from a fee application.'" *Gates v. Deukmejian*, 987 F.2d 1392, 1399 (9th Cir. 1992) (quoting *N.Y. State Ass'n for Retarded Children v. Carey*, 711 F.2d 1136, 1146 (2d Cir. 1983)). Courts applying a percentage reduction must "set forth a 'concise but clear' explanation of its reasons for choosing a given percentage reduction." *Id.* at 1400.

The Court hereby applies a twenty percent reduction to Gagliardi's fee award. The Court finds this percentage reduction to be appropriate due to Gagliardi's unsuccessful discovery pleadings, the court's prior award of sanctions to the government, and the disproportionate amount of total attorney fees requested ($136,714.00) in excess of the prospective recovery of $40,000.00 in seized funds. These factors give rise to an inference that some hours were either excessive or not reasonably expended and, in the Court's view, justify reducing Gagliardi's requested fee award by twenty percent. Accordingly, the Court reduces the $129,554.00 fee award by twenty percent, which results in a fee award of $103,643.20.

### B. Non-Taxable Costs

Gagliardi also seeks to recover $13,311.09 in non-taxable costs expended throughout this litigation. The majority of these costs accrued from a pre-trial "focus group," though Gagliardi also requests reimbursement for postage, photocopies, photographs, Westlaw research, courier, travel expenses, and transcripts.

///

Gagliardi spent $9972.00 on a "Mock Trial/Focus Group" because "[i]t appeared to counsel for Gagliardi that this case was not going to be resolved without a trial." Doc. #107 at 13. The Court finds that this was an unreasonable expense, and will not grant Gagliardi's request for reimbursement of the $9972.00 spent on this focus group. Notably, Gagliardi never filed a motion for summary judgment because he believed that trial was inevitable. If Gagliardi had filed a motion for summary judgment, it likely would have been granted, given that the Court entered judgment in Gagliardi's favor after finding that the United States did not meet its burden at the evidentiary hearing to establish that consent for the search was voluntary. Accordingly, the Court declines to grant Gagliardi $9972.00 in non-taxable costs for the premature and unnecessary focus group. *See Beach v. Wal-Mart Stores, Inc.*, 958 F. Supp. 2d 1165, 1176-77 (D. Nev. 2013) (denying $8531.42 in "mock trial/focus group" expenses because the moving party did not establish that it was customary for lawyers in the community to bill mock trial expenses as costs separate from hourly attorney fees); *Harvey v. Mohammed*, 951 F. Supp. 2d 47, 71 (D.D.C. 2013) (denying $1764.07 in "mock trial expenses" because they "qualify neither as expenses nor costs").

Gagliardi also requests $56.78 for postage, $659.80 for photocopies (including PACER), $210.43 for photographs, $825.24 in Westlaw charges, $91.12 in courier fees, $966.47 in travel expenses, and $529.25 for transcripts. The Court finds that these costs are reasonable and compensable. *See Nev. Controls*, 2013 WL 3864232 at *2 (citing *Grove*, 606 F.3d at 580) (awarding costs associated with photocopies and Westlaw research because the Ninth Circuit "held that reasonable attorney's fees 'include certain litigation expenses' including non-taxable costs such as photocopies and legal research"); *In re USA Commercial Mortg. Co.*, 802 F. Supp. 2d 1147, 1178 (D. Nev. 2011) ("[R]ecoverable costs include, among other things, reasonable costs for telecopies, photocopies, long distance telephone calls, postage, 'travel and lodging incurred taking depositions and conducting discovery,' and '[a]ny other reasonable and necessary expense incurred in connection with the action, including reasonable and necessary expenses for computerized services for legal research.'"); *Grove*, 606 F.3d at 580 (approving of "reimbursement for out-of-

11

pocket expenses including . . . travel, courier and copying costs"). Accordingly, the Court grants Gagliardi $3339.09 in non-taxable costs for the above-listed charges.

### C. Interest on Seized Currency

Gagliardi argues that he is entitled to interest on his seized currency. CAFRA provides that in cases involving seized currency, the claimant can recover "(I) interest actually paid to the United States from the date of seizure . . . that resulted from the investment of the property in an interest bearing account . . . and (ii) an imputed amount of interest that such currency . . . would have earned at the rate applicable to the 30-day Treasury bill for any period during which no interest was paid . . . commencing 15 days after the property was seized." 28 U.S.C. § 2465(b)(1)(C)(i)-(ii). The United States does not contest that awarding interest for the seized property is appropriate. Accordingly, Gagliardi shall recover interest on the $40,000.00 that the United States seized pursuant to 28 U.S.C. § 2465(b)(1)(C).

### IV. Conclusion

IT IS THEREFORE ORDERED that Gagliardi's Motion for Award of Non-Taxable Costs (Doc. #102) is GRANTED. Gagliardi is entitled to recover $3339.09 in non-taxable costs.

IT IS FURTHER ORDERED that Gagliardi's Motion for Attorney Fees (Doc. #103) is GRANTED. Gagliardi is entitled to recover $103,643.20 in attorney fees.

IT IS FURTHER ORDERED that Gagliardi shall recover interest on the seized $40,000 pursuant to 28 U.S.C. § 2465(b)(1)(C).

IT IS SO ORDERED.

DATED this 4th day of September, 2015.

_____
LARRY R. HICKS
UNITED STATES DISTRICT JUDGE